UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BRIAN N. BLADES,

        Plaintiff,

vs.                                   Case No.  3:09-cv-430-J-34MCR

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

        Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

This cause is before the Court on Plaintiff's appeal of an administrative decision

denying his application for Social Security benefits.  The Court has reviewed the record,

the briefs[2] and the applicable law.  For the reasons set forth herein, it is recommended

the Commissioner's decision be **REVERSED** and **REMANDED**.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for a period of disability, disability

insurance benefits ("DIB"), and Supplemental Security Income benefits ("SSI") on

December 27, 2006, alleging an inability to work since August 10, 2006.  (Tr. 74).  The

---

[1] Any party may file and serve specific, written objections hereto within FOURTEEN (14) DAYS after service of this Report and Recommendation.  Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein and from attacking factual findings on appeal.  See 28 U.S.C. §636(b)(1); Rule 72(b), Fed.R.Civ.P.; and Local Rule 6.02(a), United States District Court for the Middle District of Florida.

[2] The Court notes Plaintiff's brief fails to comply with Local Rule 3.01(a) in that it exceeds twenty-five (25) pages in length.  This is not the first time counsel for Plaintiff has failed to comply with the Local Rules.  (See Doc. 27, p.3).  Counsel for Plaintiff shall review the Local Rules to ensure compliance in future filings.

Social Security Administration ("SSA") denied the applications initially and upon

reconsideration.  (Tr. 24-27).  Plaintiff then requested and received a hearing before an

Administrative Law Judge ("ALJ") on August 4, 2008.  (Tr. 58-61, 355-94).  On October

30, 2008, the ALJ issued a decision finding Plaintiff was not disabled.  (Tr. 13-22).

Because the Appeals Council denied Plaintiff's request for review on February 6, 2009,

the ALJ's October 30, 2008 decision was the final decision of the Commissioner.  (Tr. 6-

9).  Plaintiff timely filed his Complaint in the U.S. District Court on May 12, 2009.  (Doc.

1).[3]

## II.     NATURE OF DISABILITY CLAIM

### A.     Basis of Claimed Disability

Plaintiff claims to be disabled since August 10, 2006 due to schizophrenia.  (Tr.

80).

### B.     Summary of Relevant Evidence Before the ALJ

Plaintiff was 38 years of age at the time the ALJ conducted the August 4, 2008

administrative hearing.  (Tr. 372).  Plaintiff has a high school diploma and past work

experience as a bench assembler and a clean-up worker.  (Tr. 81, 375).

On July 31, 1992, Plaintiff visited Dr. Thelma Manlavi at the Pennroyal Regional

Mental Health Center ("PMHC") in Hopkinsville, Kentucky for a psychiatric evaluation.

(Tr. 217-19).  Plaintiff reported his mental illness began in 1983 and had required

psychiatric hospitalization several times.  (Tr. 217).  At the time, Plaintiff was taking

---

[3] On April 12, 2010, Plaintiff filed a motion to amend the Complaint in order to reflect the fact that he was awarded DIB with an onset date of November 4, 2008. (See Doc. 25).  As the Court determined the fact that Plaintiff was awarded DIB benefits beginning November 4, 2008 would not affect the analysis, the Court denied the motion to amend.  (Doc. 27).

Mellaril and Clonopin.  Id.  Dr. Manlavi diagnosed Plaintiff with schizophrenia, and

assessed his current GAF at 60, with a GAF of 50 for the past year.  (Tr. 218).  Plaintiff

was referred to case management with the possibility of participation in the Therapeutic

Rehabilitation Program and later with Vocational Rehabilitation Services.  (Tr. 219).

Several years later, Plaintiff came under the care of Dr. Hasnain Sadiq at PMHC.

(Tr. 211).  From February 2005 to early June 2005, Dr. Sadiq saw Plaintiff every few

weeks.  (Tr. 205-13).  During that time, Plaintiff was taking Clozaril and Depakote for his

schizophrenia.  Id.  He was symptom free and experiencing no negative side effects

from his medication.  Id.  In June 2005, Plaintiff began to see Dr. Ronald Shafer at

PMHC for his schizophrenia.  (Tr. 204).  Dr. Shafer noted, "Plaintiff seems to feel all is

well and his medication has taken good effect.  To the observer, there is major

pathology with [Plaintiff's] affect.  All questions are answered with the same clipped

'okay, okay,' which is very suggestive of the schizophrenia that surely necessitates the

Clozaril."  Id.  Dr. Shafer believed Plaintiff was at his highest level of functioning and a

change in his treatment plan was not warranted at that time.  Id.

Plaintiff saw Dr. Shafer every month.  In August 2005, Dr. Shafer reported

Plaintiff responded to questions in a tense and staccato way, repeating "Alright, alright"

when asked how he was doing.  (Tr. 203).  Dr. Shafer noted, "[Plaintiff] shows affective

deficit and it is thoroughly obvious that his schizophrenia is not under the best of

control."  Id.  Despite Dr. Shafer's concerns, Plaintiff was resistant to changing his

medication regime.  Id.  When Plaintiff visited Dr. Shafer in September 2005, Plaintiff

again reported he was doing well on Clozaril and was satisfied with the way he was

feeling.  (Tr. 201).  Dr. Shafer noted, "[Plaintiff] is perhaps not doing quite as well as he

might think, for he shows great affective deficit and would easily be singled out by laymen as different." Id.  Plaintiff rejected Dr. Shafer's advice to try another medication. Id.  In October 2005, Dr. Shafer again implored Plaintiff to try a new medication regime, but Plaintiff remained resistant because he was pleased with his progress.  (Tr. 200). Dr. Shafer reported Plaintiff still had a very prominent affective deficit, although he was employed and doing fairly well.  Id.

In January 2006, Plaintiff experienced negative side effects from Clozaril, including uncontrollable drooling and seizures.  (Tr. 194).  Dr. Shafer wished to discontinue Clozaril, but Plaintiff refused.  Id.  Dr. Shafer noted, "[Plaintiff] feels he is doing very well, which is probably not quite true at all, as he shows much affective deficit."  (Tr. 194).  Plaintiff returned to Dr. Shafer in March 2006 and again reported he was doing well.  (Tr. 188).  Dr. Shafer entirely disagreed, noting Plaintiff still showed "typically schizophrenic affective deficit," needed a spit cup to handle his drool, and experienced seizures.  Id..  Dr. Shafer wrote, "It could reasonably be said [Plaintiff] is happy with his medication and his treating psychiatrist is entirely unhappy with it."  Id. Plaintiff finally agreed to switch from Clozaril to Abilify in April 2006.  (Tr. 186).

In July 2006, Plaintiff began seeing Dr. Faisal Siddiqui at PMHC for his psychiatric treatment.  (Tr. 176).  Dr. Siddiqui noted Plaintiff had "chronic mental problems," particularly schizophrenia, and assessed his GAF at 55.  (Tr. 176-77).  Dr. Siddiqui continued the plan to taper Clozaril and gradually increase Abilify.  (Tr. 177).

Plaintiff met with Dr. David Waggoner at PMHC for a psychiatric evaluation in August 2006, and Dr. Waggoner noted Plaintiff was having difficulty with the cross-over from Clozaril to Abilify.  (Tr. 167).  Plaintiff had experienced crying spells and angry

4

outbursts, and was having conflict with a male at work.  Id.  Plaintiff reported wild

thoughts and fantasies.  Id.  Plaintiff admitted he had angry thoughts about the man

"who [was] harassing him at work" but denied homicidal feelings.  (Tr. 168-69).  Plaintiff

reported he had been angry at people in the past and had thoughts of harming them.

(Tr. 168).  Dr. Waggoner noted Plaintiff seemed anxious and somewhat depressed.  Id.

While Dr. Waggoner acknowledged Plaintiff's schizophrenia was "somewhat

destabilized due to cross taper of medications," he did not think Plaintiff required

hospitalization at that time.  (Tr. 169).  However, if Plaintiff deteriorated, Dr. Waggoner

intended to start him back on Clozaril or recommend hospitalization to stabilize the

situation.  Id.  Dr. Waggoner recommended Plaintiff not return to work until Plaintiff

stabilized and the conflict with the male at work could be eliminated.  (Tr. 169-70).

Plaintiff followed up with Dr. Siddiqui later in August 2006 (Tr. 163).  Plaintiff

reported he was taking his medications regularly but still got paranoid of people calling

him names or talking negatively about him, which made him very angry.  Id.  Plaintiff

reported he angered easily and thought about hurting people, but denied having

homicidal thoughts or acting out physically.  Id.  Dr. Siddiqui noted Plaintiff had mild

psychomotor retardation and vague paranoid delusions, with a GAF of 50.  (Tr. 164-65).

Dr. Siddiqui increased Plaintiff's dosage of Abilify and Depakote.  (Tr. 166).

In September 2006, Plaintiff's case manager recommended Dr. Siddiqui meet

with Plaintiff for an emergency appointment because of troubling writings Plaintiff had

created.  (Tr. 157).  Plaintiff's sister reported Plaintiff was "doing better" on the Abilify,

was more active and alert, with no aggressive thoughts.  Id.  Plaintiff reported he had

been having weird thoughts a few weeks before about throwing furniture and fighting his

brother-in-law, but was feeling better.  Id.  Plaintiff reported he was working without any problems and denied any side effects from his medications.  Id.  Dr. Siddiqui discussed putting Plaintiff back on Clozaril, but Plaintiff elected not to because it made him slow and tired and required weekly blood tests.  Id.  Dr. Siddiqui noted Plaintiff had mild psychomotor retardation, but no apparent thought disorder, and his GAF was 50.  (Tr. 158).  For treatment, Dr. Siddiqui increased Plaintiff's dosage of Abilify to a level higher than that recommended by the pharmaceutical company.  (Tr. 159).

In October 2006, Plaintiff reported to a nurse at PMHC he was having problems at work.  (Tr. 154).  He became upset at his assistant manager and co-workers because they had criticized his work on a task, and he left without telling anyone.  Id.  The nurse noted someone would talk to his manager and ask if he could return to work.  Id.  When Plaintiff came to pick up medication two days later, he reported he continued to have problems with co-workers and was having multiple, angry thoughts and fantasies.  (Tr. 148).  Plaintiff also admitted he had thoughts of harming himself a few days before, but was no longer experiencing those thoughts.  Id.  The nurse noted Plaintiff had delusional thinking and rated his GAF at 45-50.  (Tr. 149-50).  Plaintiff expressed a desire to continue on Abilify, but was willing to add Risperdal to his regime.  (Tr. 150).

At the end of October, Plaintiff saw Dr. Siddiqui for another emergency appointment.  (Tr. 145).  Plaintiff told the doctor he wanted to cut down the dosage of Abilify because it was making him more nervous, anxious, and tired.  Id.  Plaintiff reported he was not experiencing problems at work or with other people and denied having hallucinations of any kind.  Id.  Dr. Siddiqui assessed Plaintiff with a GAF of 50 and agreed to lower the dosage of Abilify.  (Tr. 146).  The next month, Plaintiff reported

he was sleeping better with the addition of Risperdal to his medication regime and felt

more calm internally.  (Tr. 142).  The doctor noted Plaintiff was "well stabilized on the

combination of medicines that he [was] taking."  Id.

Plaintiff then married and moved to Florida in December 2006, where he was

admitted to case management for schizophrenia at the Apalachee Center, Inc. in

Tallahassee.  (Tr. 277).  At his preliminary assessment, Plaintiff cried intermittently and

reported "Satan command[ed] me to slaughter people."  (Tr. 284).  Plaintiff admitted a

history of threatening other people.  Id.  He was given a provisional diagnosis of

schizoaffective disorder.  Id.  Plaintiff was then sent for a psychiatric evaluation, where

he reported he had been off his anti-psychotic medication for a month.  (Tr. 277).  The

medical professional completing the evaluation noted Plaintiff had loose associations

and paranoid ideation.  Id.  Plaintiff had a mildly depressed mood, blunted affect, mostly

organized thought process, limited insight, limited judgment, and a GAF of 50.  (Tr. 279-

80).  Plaintiff was given a prescription for Abilify, Depakote, and Cogentin.  (Tr. 280).  At

a follow up appointment in January 2007, Plaintiff reported no side effects from his

medication.  (Tr. 276).  Plaintiff was stable on his medications, had a restricted and

inappropriate affect, with no delusions or hallucinations.  Id.

Plaintiff met with consulting psychologist, Dr. Kristen Schmidt, at the request of

the Commissioner, for a clinical evaluation in February 2007.  (Tr. 240).  Dr. Schmidt

noted Plaintiff had an unkempt appearance and made little eye contact.  Id.  He

frequently mumbled and his speech was slow in rate and low in volume.  Id.  Plaintiff

reported he had adjusted to Abilify and was doing well on his current medication regime,

although it resulted in him developing difficulty handling emotions, especially anger, and

7

he experienced some memory problems.  Id.  On Abilify, Plaintiff had more energy and

was more alert, but his moods fluctuated and he became verbally aggressive when in a

negative mood.  Id.  Plaintiff reported a history of difficulty with temper outbursts, which

interfered with his employment.  (Tr. 240-241).  Plaintiff told Dr. Schmidt he once

"smacked" a supervisor during an outburst.  (Tr. 241).  Plaintiff reported he experienced

lots of wild thoughts and fantasies about being harassed and retaliating.  (Tr. 242).

Plaintiff told Dr. Schmidt he used to experience delusions involving the devil, but he now

leads a Christian life.  Id.  Plaintiff cried during the evaluation and hid his face behind a

tissue, then peered out from behind it at the doctor.  Id.  When Dr. Schmidt asked what

was going on, Plaintiff explained he was calming himself down.  Id.  Dr. Schmidt noted

Plaintiff's affect was flat and his mood became upset when talking about his delusions.

Id.  Dr. Schmidt noted Plaintiff's judgment and insight were impaired and he had

difficulties with his thought processes.  Id.  Dr. Schmidt diagnosed Plaintiff with

schizophrenia, disorganized type.  Id.  She opined, "[h]e is generally managed with

psychotropic medications but continues to struggle with anger management and other

intense emotions.  His emotional unstability [sic] limits his employability and has

resulted in termination from previous work on a number of occasions."  Id.

     In March 2007, consulting psychologist Dr. Joseph Peterson reviewed Plaintiff's

medical record and completed a Psychiatric Review Technique ("PRT") and a Mental

Residual Functional Capacity ("MRFC") assessment.  (Tr. 255-272).  Dr. Peterson

assessed Plaintiff with no restriction of activities of daily living; moderate difficulties in

maintaining social functioning; mild difficulties in maintaining concentration, persistence,

or pace; and found insufficient evidence of episodes of decompensation.  (Tr. 265). Dr.

Peterson opined the record was "contraindicative of any diagnosable mental disorder beyond transient Adjustment Reaction arising within an individual harboring possible SCUT [Schizophrenia, chronic undifferentiated type] (in very good medical remission) and/or moderate-range personality trait disturbance." (Tr. 271). Dr. Peterson noted Plaintiff resided independently and functioned in a full range of activities of daily living within his "physical and motivational/volitional parameters, including shopping, food prep, attending church, local driving/errands, and enjoying reading, music, TV, movies, and drawing." Id. Dr. Peterson found Plaintiff was not significantly limited in social interaction or in understanding and memory. (Tr. 269-70). Dr. Peterson found Plaintiff moderately limited in his ability to maintain attention and concentration for extended periods, moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and moderately limited in his ability to set realistic goals or make independent plans. Id. Dr. Peterson opined Plaintiff was "able to sustain the mental demands of appropriate concentrated task-oriented activity at this time." (Tr. 271).

In early June 2005, Plaintiff moved to Jacksonville and met with Dr. Brian Celso at Shands for an initial psychiatric interview. (Tr. 344). Dr. Celso noted Plaintiff had a long history of mental illness and multiple inpatient psychiatric hospitalizations. Id. Plaintiff was tearful during the interview and said he was feeling depressed. Id. Plaintiff reported he often called his family in Kentucky and threatened them, but he had never acted on those threats. Id. Plaintiff reported his mood fluctuated from sadness to anger and he found creative outlets for his anger. (Tr. 344-45). Plaintiff reported he had

restless energy, which caused him to pace.  (Tr. 345).  Plaintiff denied suicidal or

homicidal thoughts, hallucinations, loose associations, or delusions.  Id.  Plaintiff

described racing thoughts that were difficult for him to stop.  Id.  Dr. Celso diagnosed

Plaintiff with schizophrenia and bipolar disorder, with the most recent episode

depressed, and assessed Plaintiff with a GAF of 55 for the last six months.  Id.  Dr.

Celso recommended a treatment plan of pyschosocial rehabilitation for an improved

level of functioning, with a continuation of the current psychiatric medication regime.  Id.

Dr. Celso then referred Plaintiff to Dr. Steven Cuffe for evaluation and management of

psychiatric medications.  Id.

    In early June 2005, another consulting psychologist, Dr. Thomas Conger,

reviewed Plaintiff's medical record and completed an MRFC and a PRT.  (Tr. 299-317).

In the MRFC, Dr. Conger found Plaintiff was moderately limited in his ability to maintain

attention and concentration for extended periods, to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at

a consistent pace without an unreasonable number and length of rest periods, to accept

instructions and respond appropriately to criticism from supervisors, to get along with

coworkers without distracting them or exhibiting behavioral extremes, and to maintain

socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness.  (Tr. 299-300).  Dr. Conger opined Plaintiff was "mentally capable of

performing simple, repetitive tasks on a sustained basis," despite concentration

problems resulting from his condition.  (Tr. 301).  Dr. Conger further opined Plaintiff's

condition caused "social difficulties as well as a negative reaction to criticism at times

but he show[ed] the ability to relate effectively in general" and had "adequate

understanding and adaptation abilities." Id.  In the PRT, Dr. Conger found Plaintiff had

mild restriction of activities of daily living; moderate difficulties in maintaining social

functioning; and moderate difficulties in maintaining concentration, persistence, or pace,

with no episodes of decompensation.  (Tr. 313).  Dr. Conger diagnosed Plaintiff with

schizoaffective disorder in partial remission.  (Tr. 316).  Dr. Conger noted Plaintiff had a

"history of significant psychiatric problems including inpatient treatment but he

appear[ed] to be improved with his current outpatient treatment program." Id.  Dr.

Conger found Plaintiff had the mental ability to perform routine activities of daily living

adequately, despite his symptoms. Id.  Dr. Conger further observed that Plaintiff had

"some anger problems," but demonstrated "the ability to relate in a socially appropriate

manner."  Plaintiff also displayed "an overall adequate mental status, with some

concentration problems noted." Id.  Dr. Conger opined Plaintiff did not meet or equal

any listing so long as he remained compliant with his treatment recommendations. Id.

On July 2, 2008, Plaintiff met with Dr. Cuffe for treatment for schizophrenia and

bipolar disorder.  (Tr. 332).  Plaintiff told Dr. Cuffe his most significant problem was

anger against family members who were harassing him. Id.  Plaintiff admitted he called

them all hours of the night and made threats. Id.  Plaintiff denied having delusions at

that time, although he had them in the past. Id.  Plaintiff reported he got power from the

devil and he would aim retribution against people who had been harassing him. Id.

Plaintiff stated he had been harassed by a police officer and felt homicidal feelings

towards him. Id.  Dr. Cuffe noted Plaintiff had experienced difficulty with looseness of

associations and thought disorder in the past. Id.  Plaintiff reported ideas popped into

his head that caused him to laugh inappropriately. Id.  Plaintiff's wife, who was at the

meeting, reported Plaintiff sometimes could not communicate a coherent thought and became upset when she was unable to understand him.  Id.  Dr. Cuffe noted Plaintiff had poor eye contact and delivered speech in soft, rapid bursts.  (Tr. 333).  Plaintiff's thoughts were linear, coherent, and goal directed, but he had difficulty expressing them.  Id.  Plaintiff's affect was flat and blunted, and he had a burst of inappropriate laughter.  Id.  Dr. Cuffe diagnosed Plaintiff with a chronic mental illness of schizophrenia, undifferentiated type, with schizotypal traits and assessed his GAF at 45.  Id.  Dr. Cuffe opined Plaintiff carried a "chronic risk of acting out on violent or angry thoughts."  Id.  Plaintiff did not require psychiatric hospitalization at that time, but Dr. Cuffe felt he needed close monitoring.  Id.  Dr. Cuffe prescribed Seroquel and continued Plaintiff on the high dosage of Abilify (above the FDA approved and indicated dosage).  (Tr. 334).  Dr. Cuffe told Plaintiff to follow up with him in two weeks.  Id.

Plaintiff returned to Dr. Cuffe on July 16, 2008.  (Tr. 330).  Again, Plaintiff reported his most significant problem was anger and irritability towards family members, most recently his mother.  Id.  Plaintiff reported he otherwise felt calmer since the increase in Abilify.  Id.  Plaintiff reported he drew pictures and that helped him.  Id.  Dr. Cuffe noted Plaintiff had poor eye contact and spoke in soft, rapid bursts.  Id.  Dr. Cuffe saw no evidence of a thought disorder, however, Plaintiff's affect was blunted and flat, with "no evidence of modulation, smiling, etc."  Id.  Dr. Cuffe opined, "[Plaintiff] continue[d] with anger and irritability with a history of making physically violent threats to family members.  Due to this continued irritability, we will consider increasing his medication."  Id.  Dr. Cuffe continued Plaintiff on Abilify and increased his dosage of Seroquel.  Id.  Dr. Cuffe referred Plaintiff for supportive psychotherapy.  Id.  Dr. Cuffe

12

told Plaintiff to follow up with him in one month.  Id.

Dr. Cuffe then completed an MRFC for Plaintiff.  (Tr. 318).  Dr. Cuffe opined Plaintiff had extreme limitations in social interaction, and noted his answers would not change if only minimal contact or interaction with others was required.  (Tr. 318-319). Dr. Cuffe found Plaintiff had mostly marked limitations in sustained concentration or persistence, with moderate limitations in his ability to maintain attention and concentration for more than brief periods of time, and extreme limitations in his ability to process subjective information accurately and to use appropriate judgment, and to perform at expected production levels.  (Tr. 319).  Dr. Cuffe opined Plaintiff had extreme limitations in his ability to respond appropriately to changes in work setting; to behave predictably, reliably, and in an emotionally stable manner; and to tolerate customary work pressures.  (Tr. 320).  He found Plaintiff had moderate limitations in his ability to remember locations and workday procedures and instructions, and to be aware of normal hazards and take necessary precautions, with only a mild limitation in his ability to maintain personal appearance and hygiene.  Id.  Dr. Cuffe believed Plaintiff's condition would worsen if he was placed under the stress of a job.  Id.  Dr. Cuffe opined, "[Plaintiff] had a diagnosis of schizophrenia and [was] still significantly symptomatic despite aggressive treatment.  Increased stress would worsen this and probably necessitate hospitalization."  (Tr. 321).

Plaintiff visited Dr. Cuffe again on August 15, 2008.  (Tr. 335).  Plaintiff reported that the increase in Seroquel had improved his agitation and irritability.  Id.  Dr. Cuffe noted Plaintiff had better eye contact and his speech was more clear and coherent, although he still spoke in rapid bursts with some stuttering.  Id.  Plaintiff's affect

13

continued to be blunted, but Plaintiff described his mood as good.  Id.  Plaintiff denied

hallucinations or paranoid ideas.  Id.  Dr. Cuffe noted Plaintiff's cognitive functioning

was intact and his judgment was improved.  Id.  Dr. Cuffe opined Plaintiff "appear[ed] to

be more calm and ha[d] improved affect with his increase in medications."  Id.  Dr. Cuffe

told Plaintiff to follow up with him in one month.  Id.

In July 2008, Plaintiff's pastor wrote a letter on behalf of Plaintiff and described

an incident that happened earlier that month where Plaintiff took offense to something

the pastor said.  (Tr. 139).  Plaintiff telephoned the pastor and made threats more than

twenty times over two nights.  Id.  When the pastor saw Plaintiff the next Sunday at

church, Plaintiff acted as though nothing had ever happened.  Id.  The pastor wrote in

the letter, "I do not consider myself to be a mental health expert, but in my estimation it

would be quite difficult for [Plaintiff] to function in any 'normal' work environment given

his current mental health condition."  Id.

At the administrative hearing, Plaintiff testified he had trouble remembering

things.  (Tr. 365).  He could not provide his zip code or phone number when asked and

could not remember what he had for dinner the night before.  (Tr. 365, 382).  Plaintiff

testified he had been harassed while working, which made him ball his fists, and he had

once hit an employer.  (Tr. 365-66).  Plaintiff testified he did not leave the house very

much, except to go to church or doctor's appointments, and only drove locally because

he would get lost on the highway.  (Tr. 366, 377, 379).  Plaintiff testified he had thoughts

about harming other people in retaliation for harassing him.  (Tr. 369).  Plaintiff stated

he drew horror pictures or made threatening phone calls to get his anger out.  (Tr. 367-

68).  He spent most of his day watching children's shows on TV, drawing, cleaning the

14

house, or walking down the street, and sometimes he visited his mother.  (Tr. 368, 370, 383).  Plaintiff testified he took his medication regularly, but they caused him to have insomnia, dry mouth, and racing thoughts or fantasies about harming people who harass him.  (Tr. 368-70, 372).

### C.   Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905 (2009).[4]  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, he is not disabled.  29 C.F.R. §§ 404.1520(b), 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy,

---

[4]  All further references to the C.F.R. will be to the 2010 version unless otherwise noted.

then he is disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Plaintiff bears the burden of

persuasion through step four, while at step five, the burden shifts to the Commissioner.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).

At step one in the instant case, the ALJ found Plaintiff met the insured status

requirements and was insured for benefits through December 31, 2011.  (Tr. 15).

Additionally, the ALJ determined Plaintiff had not engaged in substantial gainful activity

since his alleged onset date of August 10, 2006.  Id.  At steps  two and three, the ALJ

determined Plaintiff had the severe impairment of schizophrenia, however, it did not

meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr. 15-16).

The ALJ then determined Plaintiff retained the residual functional capacity

("RFC") to:

> perform a full range of work at all exertional levels but with
> the following nonexertional limitations: The claimant has no
> physical restrictions.  He has moderate limitations in his
> ability to maintain attention and concentration for extended
> periods; moderate limitations in his ability to complete a
> normal workday and workweek without interruptions from
> psychologically based symptoms and to perform without an
> unreasonable number and length of rest periods.  He also
> has moderate limitation in his ability to accept instructions
> and respond appropriately to criticisms from supervisors; to
> get along with coworkers or peers without distracting them or
> exhibiting behavioral extremes; and to maintain socially
> appropriate behavior and to adhere to basic standards of
> neatness and cleanliness.  He is capable of performing
> simple repetitive tasks on a sustained basis and has
> adequate understanding and adaptation abilities.

(Tr. 17).

At step four, the ALJ utilized the testimony of a vocational expert ("VE") during the hearing to determine whether Plaintiff could perform any of his past relevant work. The VE testified Plaintiff's RFC would permit him to perform his past relevant work as a bench assembler and a clean-up worker as those jobs were actually performed by Plaintiff and as they are generally performed. (Tr. 22). Therefore, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act. Id.

## III.   ANALYSIS

### A.   The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the

evidence as a whole, taking into account evidence favorable as well as unfavorable to

the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th

Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual

findings).

**B.    Issues on Appeal**

Plaintiff argues several issues on appeal.  Plaintiff asserts: (1) the ALJ improperly

considered the opinions of Plaintiff's medical providers, including that of Plaintiff's

treating psychiatrist, Dr. Cuffe; (2) the ALJ erred in evaluating Plaintiff's credibility; and

(3) the ALJ improperly determined Plaintiff's former jobs as a bench assembler and

clean-up worker qualified as past relevant work at step four.

**1.    Whether the ALJ improperly considered the medical opinions.**

Plaintiff makes several arguments regarding the ALJ's evaluation of the medical

opinions.  First, Plaintiff argues the ALJ did not explain the weight given to the opinions

of Dr. Cuffe, Plaintiff's treating psychiatrist.  Additionally, Plaintiff claims the ALJ

improperly rejected Dr. Cuffe's opinions and failed to identify specific reasons for

according greater weight to the opinions of the non-examining psychologists.  The

Commissioner responds that Dr. Cuffe was not a treating physician and therefore, his

opinion was not entitled to any special deference.  Furthermore, the Commissioner

argues the ALJ properly rejected Dr. Cuffe's opinion because it was unsupported by

objective medical evidence of record and was inconsistent with the reports from other

sources who examined Plaintiff.

Treating source opinions are generally entitled to increased weight.  20 C.F.R. §

404.1527(d)(2).  Specifically, if the ALJ finds a treating source's opinion was "well-

18

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [he/she] will give it controlling weight." Id. However, where some medical evidence is deemed inconsistent with the treating physician's opinion, the ALJ should still give that opinion "'substantial or considerable' weight unless 'good cause' is shown to the contrary." Poplardo v. Astrue, No. 3:06-cv-1101-J-MCR, 2008 WL 68593, at *10 (M.D. Fla. Jan. 4, 2008) (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)).  The Eleventh Circuit has determined "good cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2)  evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citing Lewis, 125 F.3d at 1440).  If the ALJ decides to disregard the opinion of a treating physician, he or she must clearly articulate the reasons for so doing.  Id. at 1241.

As an initial matter, the Court must determine whether Dr. Cuffe was indeed a treating physician.  A treating physician is "[claimant's] own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with a claimant.  20 C.F.R. § 404.1502.  In considering whether a claimant and a particular physician have an ongoing treatment relationship, an ALJ will consider whether "the medical evidence establishes that [the claimant was treated by the physician] with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] condition(s)."  Id.

Pursuant to the regulations, a physician may still be considered a "treating source" even if the physician has examined the claimant "only a few times or only after long intervals (e.g., twice a year) . . . if the <u>nature and frequency of the treatment or evaluation is typical</u> for [the claimant's] condition."  20 C.F.R. § 404.1502 (emphasis added).  Section 404.1502 thus explicitly provides that an ALJ may take frequency of treatment into consideration when determining whether a physician is a "treating source." <u>See</u> <u>id.</u>  Here, it is not entirely clear whether the ALJ considered Dr. Cuffe to be a treating source.  The ALJ specifically noted Dr. Cuffe had seen Plaintiff on only two occasions prior to the hearing.  (Tr. 18).  The ALJ also noted that Dr. Cuffe evaluated Plaintiff once after the hearing.  (Tr. 19).  The Commissioner argues Dr. Cuffe should not be considered a treating source because he "did not have an ongoing treatment relationship with Plaintiff."  (Doc. 21, p.11).  The Court does not agree.

The records from Shands Jacksonville indicate Dr. Cuffe had a treating relationship with Plaintiff.  On June 5, 2008, Plaintiff was referred to Dr. Cuffe for evaluation and management of psychiatric medications.  (Tr. 345).  Dr. Cuffe met with Plaintiff for the first time on July 2, 2008.  (Tr. 332).  At the conclusion of that meeting, Dr. Cuffe noted Plaintiff would be seen in two weeks for follow-up.  (Tr. 334).  Dr. Cuffe met with Plaintiff again in two weeks, on July 16, 2008, at which time Dr. Cuffe stated he would see Plaintiff again in one month.  (Tr. 339).  On August 15, 2008, Dr. Cuffe met with Plaintiff and again noted that he would be seeing Plaintiff for follow-up in one month.  (Tr. 330).  These records indicate an ongoing treatment relationship.  Accordingly, the Court finds Dr. Cuffe was a treating physician.

The Court will now determine whether the ALJ provided the good cause

necessary to give Dr. Cuffe's opinion less than controlling or substantial weight.  The ALJ

provided the following explanation for discounting Dr. Cuffe's opinions:

> Dr. Cuffe's opinion is not entitled to controlling weight
> because it is not well-supported by medically acceptable
> clinical and laboratory diagnostic techniques.
>
> The medical source statement from Dr. Cuffe . . . indicated
> the claimant had extreme limitations in social interaction,
> sustained concentration or persistence and adoption. [sic]
> This assessment is unsupported by the objective medical
> evidence of record, and is inconsistent with the reports from
> the other sources who have examined the claimant.  No
> other treating source has assessed limitations which are
> similar to those identified by Dr. Cuffe.
>
> Dr. Cuffe's opinion was inconsistent with the opinion of the
> medical consultants for the State agency who reviewed the
> record.  Although the medical consultants for the State
> Agency identified some limitations, they concluded that the
> record did not support a finding that the claimant has been
> precluded from all levels of vocational functioning, and
> accordingly, I have given them greater weight.

(Tr. 21).

Plaintiff argues the ALJ failed to properly evaluate Dr. Cuffe's opinions pursuant to

20 C.F.R. § 404.1527.  The ALJ is required to evaluate every medical opinion he/she

receives, regardless of the source.  20 C.F.R. § 404.1527(d).  The ALJ is also required to

"state with particularity the weight he gave the different medical opinions and the reasons

therefor."  Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v.

Bowen, 786 F.2d 1050, 1053 (11th Cir.1986)).  Pursuant to the regulations, the weight an

ALJ must give medical opinions varies according to the relationship between the medical

professional and the claimant.  20 C.F.R. § 404.1527(d); SSR 96-6p.  "The opinions of

examining physicians are generally given more weight than non-examining physicians; treating physicians receive more weight than nontreating physicians; and specialists on issues within their areas of expertise receive more weight than non-specialists." Preston v. Astrue, No. 2:09-cv-0485-SRW, 2010 WL 2465530, at *6 (M.D. Ala. June 15, 2010) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)).  When the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must apply other factors.  See 20 C.F.R. § 404.1527(d).  In determining the weight given to a medical opinion, the ALJ must consider 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

The undersigned finds the ALJ did not properly discount Dr. Cuffe's opinions and erred in assigning greater weight to the non-examining medical consultants.  While the ALJ found Dr. Cuffe's opinion was not entitled to controlling weight, he did not state with particularity how much, if any, weight was given to Dr. Cuffe's opinion.  (Tr. 13-26).  The ALJ also failed to explain how much weight was given to the report of the state's examining psychologist, Dr. Schimdt.[5]  This Court cannot conduct a meaningful review "if the ALJ does not state with sufficient clarity the legal rules being applied and the weight

---

[5] The ALJ stated, "Dr. Cuffe's opinion was inconsistent with the opinion of the medical consultants who reviewed the record," and, accordingly, he gave those medical consultants' opinions greater weight.  (Tr. 21) (emphasis added).  Thus, although not clearly stated, it appears the ALJ gave the greatest weight to the non-examining consultants, less weight to the examining psychologist, and even less, or no, weight to the treating psychiatrist.

accorded the evidence considered." <u>Ryan v. Heckler</u>, 762 F.2d 939, 941 (11th Cir. 1985). If the ALJ completely discounted Dr. Cuffe's opinion, as he appears to have done,[6] the ALJ failed to adequately explain why Dr. Cuffe's opinion was not entitled to any weight.

The ALJ's contention, without further explanation, that Dr. Cuffe's opinions were "not well-supported by medically acceptable clinical and laboratory diagnostic techniques" is unduly vague. Plaintiff had a long-standing and undisputed diagnosis of schizophrenia, and Dr. Cuffe's treatment of Plaintiff, utilizing anti-psychotic medication and therapy, was consistent with the usual treatment of a person with such condition.

The ALJ found Dr. Cuffe's MFRC assessment was "unsupported by the objective medical evidence." (Tr. 21). However, Dr. Cuffe's opinion is not entirely inconsistent with the objective medical evidence, and the ALJ does not explain what portion of his opinion is inconsistent. Plaintiff has a long history of aggressive outbursts in reaction to perceived criticism or harassment, difficulty controlling his emotions, and trouble relating to others in a consistent and reliable manner, even when compliant with his medication regime. Plaintiff testified he had thoughts about harming other people in retaliation for harassing him. (Tr. 369). Plaintiff's pastor and family members described incidents where Plaintiff repeatedly harassed them with threatening phone calls and then acted like nothing happened. (Tr. 139, 365). Plaintiff physically attacked his supervisor at work in reaction to negative criticism. (Tr. 241, 365-66). At the hearing, Plaintiff testified

---

[6] It appears the ALJ completely discounted Dr. Cuffe's opinion, as Dr. Cuffe assessed Plaintiff with extreme limitations in several areas of social interaction and sustained concentration or persistence. The VE testified if Plaintiff had extreme limitations in any of the areas assessed in the MRFC, he would be precluded from competitive employment, because "[t]hat would indicate . . . the need for supported assistance to maintain some type of work activity." (Tr. 392-93).

he draws horror pictures and makes obscene phone calls to get his anger out.  (Tr. 367-68).  These facts corroborate Dr. Cuffe's opinion that Plaintiff had extreme impairments in the ability to accept instruction from or respond appropriately to criticism from supervisors (Tr. 318); the ability to process subjective information accurately and to use appropriate judgment (Tr. 319); and the ability to behave predictably, reliably, and in an emotionally stable manner (Tr. 320).

Dr. Cuffe's subsequent examination of Plaintiff following the completion of the Mental RFC assessment noted Plaintiff appeared "more calm and ha[d] improved affect with his increase in medications."  (Tr. 335).  However, this does not "contradict his opinion of extreme and marked limitations" as the Commissioner suggests.  (Doc. 21, p. 11).  Dr. Cuffe attributed Plaintiff's improvement solely to the increase in medication, as prescribed at his previous appointment.  (Tr. 335).  While medication improves Plaintiff's condition, it has not been a completely successful or consistent treatment over the long term.  Over the years, Plaintiff's doctors have repeatedly changed the type of medicine and the dosage used in an effort to stabilize Plaintiff and reduce unwanted side effects.  (Tr. 142, 150, 159, 166, 186, 330).  Plaintiff often experienced stability on one medication for a period of time before requiring adjustment due to negative side effects, recurring symptoms, or a lack of long-term stability in his condition.  "[O]ccasional symptom free periods, and even sporadic ability to work, are not inconsistent with finding that a claimant suffers disability."  O'Neal v. Astrue, No. 3:08-CV-63-J-MCR, 2009 WL 702865, at *8 (M.D. Fla. March 17, 2009) (citing Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995)).

The ALJ further noted Dr. Cuffe's MRFC assessment was "inconsistent with the reports from the other sources who have examined the claimant," because no other treating source had assessed limitations similar to those identified by Dr. Cuffe.  (Tr. 21).  However, no other treating source completed an MRFC or otherwise opined on Plaintiff's ability to do basic work activities and sustain long-term employment.  Silence regarding Plaintiff's ability to work is susceptible to inference, "therefore, no inference should be taken."  Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988).  Further, Dr. Cuffe's opinions were corroborated by those of the examining state psychologist, Dr. Schmidt, who noted Plaintiff's judgment and insight were impaired and he had difficulty with his thought processes.  (Tr. 242).  In her report, Dr. Schmidt described odd behavior where Plaintiff hid his face behind a tissue and peered out at her from behind it.  Id.  She noted Plaintiff experienced wild thoughts and fantasies "that [were] often about being harassed and retaliating."  Id.  Dr. Schmidt opined Plaintiff was "generally managed with psychotropic medications but continue[d] to struggle with anger management and other intense emotions."  Id.  She further noted Plaintiff's "emotional unstability [sic] limit[ed] his employability and ha[d] resulted in termination from previous work on a number of occasions."  Id.  These notes and opinions are not inconsistent with the limitations assessed by Dr. Cuffe in social interaction, sustained concentration or persistence, and adaptation.

Accordingly, the Court finds the foregoing reasons do not provide the good cause necessary for the ALJ to discredit Dr. Cuffe's opinion.

Considerable weight was obviously placed on the reports of the two non-examining physicians.[7]  The ALJ found Dr. Cuffe's opinion was not entitled to controlling weight because it was "inconsistent with the opinion of the medical consultants for the State who reviewed the record."  The ALJ explained, "Although the medical consultants for the State Agency identified some limitations, they concluded that the record did not support a finding that the claimant has been precluded from all levels of vocational functioning, and <u>accordingly</u>, I have given them greater weight."  (Tr. 21) (emphasis added).  This language suggests the ALJ determined that because the non-examining consultants reports concluded Plaintiff was not disabled, their opinions were entitled to greater weight.  It appears the ALJ largely determined Dr. Cuffe's report should be discounted because it contradicted the reports of the non-examining physician.  This was error.  "The good cause required before the treating physicians' opinions may be accorded little weight is not provided by the report of a nonexamining physician where it contradicts the report of the treating physician."  <u>Lamb</u>, 847 F.2d at 703 (11th Cir. 1988) (citing <u>Johns v. Bowen</u>, 821 F.2d 551, 554 (11th Cir. 1987)).  The opinion of a non-examining physician that is contrary to the opinion of the examining physician is entitled to little weight unless the opinion of the examining physician has been properly rejected. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986); <u>Spencer ex. rel. Spencer v. Heckler,</u> 765 F.2d 1090, 1094 (11th Cir. 1985).  "[R]eports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to

---

[7] Without actually citing to them, the ALJ quoted extensively from these reports when determining Plaintiff's statements concerning the intensity, persistence, and limiting effects of his schizophrenia were not credible to the extent they were inconsistent with the RFC.

base an administrative decision."  Spencer, 765 F.2d at 1094.

The undersigned is further unconvinced the opinions of the non-examining consultants, Drs. Conger and Peterson, were entitled to greater weight than those of Dr. Cuffe, because the ALJ failed to address the inconsistencies in the medical opinions to which he assigned "greater weight."  See Preston v. Astrue, No. 2:09-cv-o485-SRW, 2010 WL 2465530, at *8 (M.D. Ala. June 15, 2010) ("Because the ALJ failed to address inconsistencies in the medical opinions to which he assigned 'great weight' and because he failed to even mention [treating physician's] opinion...this court cannot conclude that the ALJ properly weighed the various medical opinions of record . . . .").  Dr. Conger diagnosed Plaintiff with schizoaffective disorder, in partial remission, and opined Plaintiff had moderate limitations in the ability to respond appropriately to criticism and to get along with coworkers without distracting them and exhibiting behavioral extremes.  (Tr. 316).  On the other hand, Dr. Peterson did not believe Plaintiff currently suffered from schizophrenia, despite a long history of diagnosis.  Dr. Peterson opined the record was "contraindicative of any diagnosable mental disorder beyond transient Adjustment Reaction arising within an individual harboring possible SCUT [Schizophrenia, chronic undifferentiated type] (in very good medical remission) and/or moderate-range personality trait disturbance."  (Tr. 271).  Dr. Peterson found no evidence of a limitation in Plaintiff's ability to respond appropriately to criticism and to get along with coworkers without distracting them or exhibiting behavioral extremes.  (Tr. 270).  This opinion is inconsistent with the medical record and conflicts with the reports from the other consulting physicians and Plaintiff's treating physicians.  The ALJ should have addressed these inconsistencies before assigning "greater weight" to conflicting reports

27

from two non-examining physicians.

In the instant case, the ALJ turned the hierarchy established in 20 C.F.R. § 404.1527 on its head.  Without adequate explanation or specificity, the ALJ gave the greatest weight to the opinions of the non-examining consultants, Dr. Conger and Dr. Peterson, less weight to the opinion of the State's examining psychologist, Dr. Schmidt, and little or no weight to the opinion of Plaintiff's treating psychiatrist, Dr. Cuffe.  For the aforementioned reasons, the undersigned finds the ALJ failed to properly evaluate the medical opinions.  As such, the ALJ's decision is not supported by substantial evidence.

Although the Court finds the ALJ erred in his application of the legal standards, the Court declines to enter an order requiring entitlement to disability benefits.  While it is true the opinion of Dr. Cuffe provides strong evidence of disability, it is at least arguable the record supports a contrary finding.  Consequently, it is appropriate that the evidence be evaluated in the first instance by the ALJ pursuant to the correct legal standards.

**2.      Whether the ALJ improperly evaluated Plaintiff's credibility.**

Plaintiff contends the ALJ failed to properly evaluate his credibility because the ALJ did not articulate specific reasons for questioning Plaintiff's credibility.  (Doc. 18, p. 23).  In response, the Commissioner argues the ALJ applied the proper standards in evaluating subjective complaints of symptoms and properly considered Plaintiff's ability to work with his impairments; the medical opinions of the record; the type, extent, and effectiveness of Plaintiff's treatment; the side effects from Plaintiff's medications; and Plaintiff's daily activities.  (Doc. 21, p. 3-14).

Under the Eleventh Circuit's "pain standard," the ALJ must consider a plaintiff's subjective testimony of pain if he finds "(1) evidence of an underlying medical condition,

28

and either (2) objective medical evidence that confirms the severity of the alleged pain

arising from that condition or (3) that the objectively determined medical condition is of

such a severity that it can reasonably be expected to give rise to the alleged pain." Holt

v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); see also Marbury v. Sullivan, 957 F.2d

837, 839 (11th Cir. 1992).  Although it refers to pain, the standard also applies to

complaints of subjective conditions other than pain.  Holt, 921 F.2d at 1223 (citing

Jackson v. Bowen, 873 F.2d 1111, 1114 (8th Cir. 1989)).  If the ALJ finds the plaintiff's

subjective testimony not to be credible, "he must articulate explicit and adequate

reasons" to support this finding.  Id. (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir.

1987)).  The ALJ must consider the factors outlined in SSR 96-7p when discrediting a

claimant's pain testimony, however, the ALJ is not required to explicitly discuss each

factor.  O'Neal v. Astrue, No. 3:08-cv-63-J-MCR, 2009 WL 702865, at *8 (M.D. Fla.

March 17, 2009).

     In the instant case, the ALJ applied the pain standard and found:

> claimant's medically determinable impairment could
> reasonably be expected to cause the alleged symptoms;
> however, the claimant's statements concerning the intensity,
> persistence[,] and limiting effects of these symptoms are not
> credible to the extent they are inconsistent with the above
> residual functional capacity assessment.

(Tr. 20).  In support of this determination, the ALJ recounted the findings of the two non-

examining State Agency physicians by quoting entire passages from their respective

reports without citation.  Thus, the ALJ appears to have relied exclusively on the findings

of the non-examining physicians when determining that Plaintiff's subjective testimony

was not credible.  The ALJ then stated, without further explanation, "The claimant's

activities of daily living and the medical evidence of record suggest that the claimant can

sustain a greater capacity than he described at the hearing or in his reports to the state

agencies." (Tr. 21). However, the ALJ did not explain what inconsistencies existed

between Plaintiff's statements, his activities of daily living, and the medical record.

As the Court is remanding this case for the ALJ to re-evaluate the medical

opinions, the Court will ask the ALJ to re-evaluate Plaintiff's credibility, as well. While

doing so, the ALJ should provide more detail regarding his credibility findings, such as an

explanation of what statements he finds not credible and why.

### 3.   Whether the ALJ improperly considered Plaintiff's past relevant work.

Finally, Plaintiff argues the ALJ improperly determined Plaintiff's former jobs as a

bench assembler and clean-up worker were past relevant work at step four because both

jobs were performed under special conditions and were not substantial gainful activity.

Plaintiff bears the burden of persuasion through step four of the disability

determination process. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294

n.5 (1987). Thus, Plaintiff bears the burden of showing that certain work experience is

not past relevant work. Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). Past

relevant work is work performed within the past 15 years, that was substantial gainful

activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. §

404.1573(c). Substantial gainful activity may be performed under special conditions that

take into account the claimant's impairment, such as work performed in a sheltered

workshop or as a patient in a hospital. Id. Special conditions might include irregular

hours or frequent breaks, assignment of work tasks especially suited to claimant's

impairment, assistance from other employees, or permission to work at a lower standard of productivity or efficiency.  Id.  Work performed under special conditions may be considered substantial gainful employment if it shows the claimant has the necessary skills and ability to work at the substantial gainful activity level.  Id.

Plaintiff first argues the ALJ improperly determined Plaintiff's work as a bench assembler was past relevant work because both the ALJ and the VE acknowledged it was sheltered employment and such work is generally not considered substantial gainful activity.  Plaintiff is correct that both the ALJ and the VE acknowledged his past work as a bench assembler was performed in a sheltered workshop environment.  (Tr. 22).  However, under the regulations, work performed in a sheltered workshop may still be considered past relevant work.  A finding of sheltered employment does not automatically end the step four determination, as Plaintiff suggests.  In the instant case, the VE testified although Plaintiff's work as a bench assembler was performed in a sheltered workshop environment, the demands of this type of work as generally performed would not exceed Plaintiff's RFC as presented in the hypothetical.  (Tr. 391).  Therefore, the ALJ did not err in considering the bench assembler position at the step four determination.

Plaintiff then argues his job as a clean up worker was performed under special conditions and the ALJ failed to address this issue.  However, Plaintiff did not raise this argument at the hearing.  During the hearing, the ALJ, Plaintiff's attorney, and the VE all talked extensively about the fact that the bench assembler position was sheltered employment.  (Tr. 384-86, 389-91).  However, when the ALJ moved on to discussion of

the clean-up worker position, there was no further reference by Plaintiff or his attorney to special conditions or a sheltered environment.  Plaintiff specifically argued the assembly job was not past relevant work, but did not present this same argument for the clean-up worker position, despite having the opportunity to do so.[8]  (Tr. 385).  Plaintiff bears the burden of showing certain work experience is not past relevant work.  <u>Barnes</u>, 932 F.2d at 1359.  Therefore, the ALJ did not err in considering the clean-up worker position at the step four determination.

## V.   CONCLUSION

For the foregoing reasons, the undersigned finds the ALJ's decision is unsupported by substantial evidence and is not based upon the proper legal standards. Accordingly, it is hereby

**RECOMMENDED**:

The Commissioner's decision be **REVERSED AND REMANDED**.  On remand, the Commissioner should be directed to: (1) review the opinions and findings of Dr. Cuffe, explain in detail the amount of weight afforded to his opinions, and if any part of his opinion is rejected, explain fully why it is being rejected; (2) review the opinions and findings of Dr. Schmidt, explain in detail the amount of weight afforded to her opinions, and if any part of her opinion is rejected, explain fully why it is being rejected; (3) review

---

[8] The following exchange occurred at the hearing:
> Plaintiff's Attorney: I don't think that was really a work experience, Your Honor. That was –
> ALJ: Which years are we talking about?
> Plaintiff's Attorney: That was the assembly jobs.

(Tr. 385).

Plaintiff's testimony, evaluate Plaintiff's credibility, and explain what statements, if any, are not credible and why they are not credible; and (4) conduct any other proceedings deemed necessary.

It is further recommended that should this Report and Recommendation be adopted and should the remand result in the award of benefits, Plaintiff's attorney be granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days after the date of a notice of award of benefits from the Social Security Administration

**DONE AND ENTERED** at Jacksonville, Florida, this _5th_ day of August, 2010.


_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record
The Honorable Marcia Morales Howard,
        United States District Judge